**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-61166-CIV-SEITZ/GOODMAN**

POINT BLANK SOLUTIONS, INC.,
a Delaware corporation, and POINT
BLANK BODY ARMOR, INC., a
Delaware corporation,

       Plaintiffs,

vs.

TOYOBO AMERICA, INC., a New
York corporation and TOYOBO CO.,
LTD., a Japanese corporation,

       Defendants.

_____/

**ORDER ON MOTION TO DETERMINE SPOLIATION**
**OF EVIDENCE AND APPROPRIATE SANCTIONS**

      This matter is before the Court on Plaintiffs' Motion for Determination of

Spoliation of Evidence and Appropriate Sanctions. (DE# 118). The Court has reviewed

the motion and associated briefing and held an evidentiary hearing and oral argument on

January 14, 2011. After careful review of this record, the Court **denies** the motion.

**I.     INTRODUCTION**

      Well known politician Thomas P. O'Neill Jr. (1912 – 1994), sometimes known as

"Tip" O'Neill, famously said that "all politics is local."[1]  Judicial decisions are also local

---

[1]     http://www.brainyquote.com/quotes/quotes/t/thomaspo212119.html (last visited Mar. 18, 2011). Tip O'Neill was the "gregarious and irrepressibly liberal Bostonian who symbolized the Democratic Party through much of the 1980's as Speaker of the House." While a senior at Boston College, he ran for the Cambridge City Council, finishing ninth in a field of 60 candidates, of whom the top eight were elected. Mr. O'Neill had not campaigned in his own neighborhood, which he taken for granted and where he made a poor showing. He lost the critical eighth spot by 150 votes. In a post-mortem on the campaign, Mr. O'Neill's father told him what he had learned in a lifetime of politics and

-- because federal district courts must follow their "local" circuit courts of appeals in the absence of a contrary U.S. Supreme Court decision. This maxim of jurisprudence arises here as an initial matter because some circuit and district courts in other "local" circuits apply differing rules for analyzing electronic discovery spoliation claims.

In this Circuit, a court cannot give an adverse inference jury instruction -- the primary, specific relief sought by Plaintiffs -- as a sanction for spoliation of documents or other discovery information, including emails, unless there is evidence of **bad faith**. In some other circuits, however, the culpable state of mind necessary to support a spoliation inference includes **ordinary negligence** or **willful conduct** short of bad faith. Given this difference, as well as other differences in the law of sanctions for spoliation in the e-discovery context, the result here may have been different if evaluated by a court in another circuit.

In any event, the Court's analysis here must comply with our "local" Eleventh Circuit law, which requires bad faith, not mere negligence or gross negligence, before imposing an adverse inference jury instruction. Because Plaintiffs have not established that bad faith is the cause of the allegedly deleted emails and electronically stored information (ESI), the Court cannot order an adverse inference jury instruction at trial.

But Plaintiffs are not entitled to an adverse inference here for *another* reason beyond the absence of bad faith -- their failure to establish that the missing evidence is *crucial* to their ability to prove their prima facie case.[2]

---

what "Tip" would later use as his own political commentary: "All politics is local." http://www.nytimes.com/learning/general/onthisday/bday (last visited Mar. 18, 2011).

[2]       This is another requirement which is missing or different in other circuits for an adverse inference instruction.

Nevertheless, the Court agrees with Plaintiffs that Defendants failed to produce some responsive documents in discovery because Defendants destroyed (or deleted or purged or overwrote) electronic evidence when they were under a duty to preserve such evidence. The Court also finds that Defendants and/or their counsel negligently implemented and failed to monitor a litigation hold which Defendants claim to have put in place in November 2003 pursuant to an *oral* instruction. As I will outline below, the contours of the oral instruction are, at best, uncertain and confusing, and, in any event, were not consistently followed.

But notwithstanding Defendants' lackluster adherence to their nebulous oral instruction, the alleged destruction of evidence arose primarily when Defendants were under a duty to *others* (such as government officials who issued subpoenas), but not necessarily these Plaintiffs, and **these other litigants are not parties to this litigation and have not sought sanctions against these Defendants.** In other words, the parties who do (or did) have standing to seek spoliation sanctions have not pursued them. The Court is reluctant to create a new legal precedent which would establish some type of free-floating or shifting duty which other parties could latch onto in order to seek the sanctions which the parties with standing choose not to pursue.

But Defendants and their counsel should not take too much comfort in the denial of the motion and the decision to not grant the request for an adverse inference jury instruction. They failed to take the proper steps to adequately implement and monitor the litigation hold they claim was instituted in November 2003. Given that some of the documents subject to the poorly implemented litigation hold (put in place in November 2003) were responsive to subpoenas issued by *government* investigators or related to

3

government investigations, the inadequate efforts to preserve documents (albeit those required to be produced to parties other than Plaintiffs) were discovery errors caused, at a minimum, by negligence.

Given this reality, Defendants' discovery conduct is disconcerting. Nevertheless, the Court cannot grant Plaintiffs' alternate request for "other" sanctions besides an adverse inference in connection with a spoliation motion, such as an award of fees and costs, because spoliation has not been established and because there has been no showing of bad faith.

Although there are cases where the court awarded fees and costs to litigants while declining to issue an adverse inference instruction, those cases are inapplicable here because the culpable conduct -- e.g., gross negligence -- resulted in the loss of evidence at a time when the producing party was undeniably under a preservation duty to the moving party and because the evidence was destroyed *after* a lawsuit had been filed. Here, the document preservation duty in effect when Toyobo allegedly destroyed evidence was a duty running in favor of others, but not necessarily to Point Blank (and certainly not while Point Blank's lawsuit against Toyobo was pending).

One final point by way of introductory summary: the Court's ruling denying an adverse inference jury instruction and other sanctions does not preclude Plaintiffs from seeking to introduce evidence of Defendants' and/or their counsel's negligent failure to implement and to monitor litigation holds. Of course, this Court does not prejudge the admissibility of such evidence at trial.

## II.  JURISDICTIONAL AUTHORITY

Magistrate judges may issue an order on any "a pretrial matter not dispositive of a party's claim or defense." Fed. R. Civ. P 72(a). Such an order may not be set aside

unless it "is clearly erroneous or is contrary to law." *Id.*  Thus, magistrate judges have jurisdiction to enter sanctions orders for discovery failures which do not strike claims, completely preclude defenses or generate litigation-ending consequences.   Practice Before Federal Magistrates, § 16.06A (Mathew Bender 2010) ("discovery sanctions are generally viewed as non-dispositive matters committed to the discretion of the magistrate unless a party's entire claim is being dismissed").

In determining between dispositive and non-dispositive discovery sanctions, the critical factor is what sanction the magistrate judge *actually imposes*, rather than the one *requested* by the party seeking sanctions.  *Gomez v. Martin Marietta Corp.,* 50 F.3d 33 1511, 1519-20 (10th Cir. 1995) (rejecting argument that magistrate judge ruled on dispositive motion because litigant sought entry of a default judgment and explaining that "[e]ven though a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Rule 72(a)); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3068.2, at 342-44 (West 1997).

A recent case illustrates a magistrate judge's ability to enter a significant discovery sanction order when the effect is not similar to a default judgment or to preclude a defense.  In *Moore v. Napolitano*, 723 F. Supp. 2d 167 (D.D.C. 2010), the district judge affirmed a magistrate's discovery sanctions order.  In doing so, the district court rejected the argument that the magistrate judge entered a "severe sanction akin to a litigation-ending default judgment" and affirmed the magistrate judge's order precluding the defendant from offering any legitimate, nondiscriminatory reason to rebut any prima facie case of disparate treatment discriminatory nonpromotion of the individually named

plaintiffs in an employment discrimination case.  *See also Carmona v. Wright*, 233

F.R.D. 270, 276  (N.D.N.Y. 2006) (magistrate judges permitted to enter sanctions orders

for discovery violations because they are "generally non-dispositive matters" unless the

order imposes a sanction which "disposes of a claim; e.g., striking pleadings with

prejudice or dismissal"); *Exxon Corp. v. Halcon Shipping Co. Ltd.,* 156 F.R.D. 589

(D.N.J. 1994) (magistrate judge's order precluding expert witness from testifying as a

sanction for violation of a pretrial discovery order was reviewed under the clearly

erroneous or contrary to law standard of review); *San Shiah Enterprise Co., Ltd. v. Pride*

*Shipping Corp.,* 783 F. Supp. 1334 (S.D. Ala. 1992) (magistrate judge authorized to

impose Rule 11 sanctions).

Federal magistrate judges in this circuit frequently enter orders in cases where

parties seek sanctions, including default judgments or dismissals, for spoliation. *See, e.g.,*

*Calixto v. Watson Bowman Acme Corp.,* No. 07-60077-CIV, 2009 WL 3823390 (S.D.

Fla. Nov. 16, 2009) (Rosenbaum, J.); *Atlantic Sea Co., S.A., v. Anais Worldwide*

*Shipping, Inc.*, No. 08-23079-CIV, 2010 WL 2346665 (S.D. Fla. June 9, 2010) (Brown,

J.); *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.,* 736 F. Supp. 2d 1317 (S.D.

Fla. 2010) (O'Sullivan, J.).  Indeed, federal magistrate judges in Florida have entered

orders imposing adverse inferences and attorney's fees as sanctions in spoliation

scenarios.  *Optowave Co., Ltd. V. Nikitin*, No. 6:05-cv-1083-Orl-22DAB, 2006 WL

3231422 (M.D. Fla. Nov. 7, 2006) (Baker, J.) (imposing adverse inference jury

instruction based on intentional failure to produce highly relevant emails); *Preferred*

*Care Partners Holding Corp. v. Humana, Inc.*, No. 08-20424-CIV, 2009 WL 982460

(S.D. Fla. Apr. 9, 2009) (Simonton, J.) (awarding costs and fees for "grossly negligent

discovery conduct" leading to the destruction of emails when bad judgment, but not bad faith, was responsible for the errors).

Because an adverse inference instruction does not strike a claim or defense and, in any event, this Order does not grant any relief to the movants, this is a non-dispositive ruling that can be determined by a magistrate judge under Rule 72(a).

## III.    GENERAL OVERVIEW

Plaintiffs' motion requires the Court to analyze the critical and sometimes hazy legal zone where the dynamic, constantly-changing world of e-discovery intersects with the fact-intensive area of spoliation.  It also requires the Court to determine the level of culpability associated with Defendants' discovery shortcomings.

The law concerning e-discovery (and the ever-increasing obligations of parties and witnesses in their electronically stored documents) has evolved significantly over the past few years, and the applicable rules sometimes vary among circuits.  Therefore, to the extent that there is not a national rule or a clear rule in the Eleventh Circuit, the Court will follow the law concerning preservation duties that has been developed by judges in this circuit and district.[3]

---

[3]        By way of example, United States District Judge Shira A. Scheindlin has written extensively on e-discovery issues and is recognized as one of the nation's experts on this dynamic area of the law.  Judge Scheindlin, for example, is the co-author of "Electronic Discovery and Digital Evidence" (West 2008) and was a member of the Judicial Conference of the United States Advisory Committee on Rules of Civil Procedure from 1998 to 2006, where she was actively involved in drafting the e-discovery amendments to the Federal Rules of Civil Procedure. However, Judge Scheindlin is in the Second Circuit, which has some rules which are different than those in our Eleventh Circuit. Moreover, Judge Scheindlin's views, while widely quoted and cited, are not always followed by other judges in her district.  *See Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 440 (S.D.N.Y. 2010) (analyzing Judge Scheindlin's opinion in *Pension Committee v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456, 467 (S.D. N.Y. 2010), and "respectfully disagree[ing] if the 'implication' from a 'fair reading' of"

The Court will first summarize the spoliation allegations against the Defendants in this case.  Next, the Court will outline the basic legal principles governing e-discovery (sometimes referred to as discovery of electronically stored information, or ESI) and spoliation sanctions in the Eleventh Circuit.  It will then summarize the facts and make findings of fact.  Finally, the Court will apply the law to the facts and explain its assessment of the applicable factors.

## IV.   SPOLIATION ALLEGATIONS

In an effort to demonstrate spoliation and to support their request for an adverse inference, Plaintiffs submitted a sampling of email correspondence from December 2003 through 2005 that they claim was destroyed and not produced by Defendants.  According to Plaintiffs, the documents contain the following information:

(i)   An acknowledgement by Toyobo that "Michigan Law Enforcement Group . . . defined the Zylon issue as a 'controversy' and advised "others to looks at all Zylon vests as a single group."

(ii)   Zylon degradation data misrepresenting Zylon deterioration of 5% over at least 1000 days at room temperature.

(iii)   Discussions and representations regarding Toyobo's purported fix/new Zylon.

---

Judge Scheindlin's opinion in *Pension Committee* is that "some sanctions are warranted even if the lost information did not have discovery relevance and even if there has been no showing that the information was likely to have helped the innocent party").

Judge Scheindlin is also an Observer to The Sedona Conference Working Group on Electronic Document Retention and Production and serves on The Sedona Conference Advisory Board.

(iv)   A document discussing a contract between Toyobo and Point Blank, which Plaintiffs contend is of extreme significance given Defendants' refusal to acknowledge privity exists.

(v)   Various meetings between the parties -- including those where Toyobo brings weavers with them. Plaintiffs view this as significant because they say Toyobo continues to deny privity exists and that evidence of systematic contacts and meetings are therefore important.

Plaintiffs contend that Defendants also destroyed communications with body armor manufacturers other than Second Chance, including First Choice Armor & Equipment, and Armor Holdings, Inc. from December, 2003 through 2005.   These documents show information which Point Blank says is critical information to its case, including:

(1).   Documents evidencing direct sales of Zylon from Toyobo to Armor Holdings, including invoices and shipping logs.

(2).   Documents which the fact finder could reasonably determine show efforts to conceal Toyobo America's involvement in the sale of Zylon, such as one saying "send the invoice to our New York office, but do not mention anything about our New York office on the invoice."

(3).   Correspondence to Toyobo from Armor Holdings expressing safety concerns over that company's Zylon vests: "We are concerned for the safety of those officers wearing our Zylon-based models."

Plaintiffs also contend that Toyobo destroyed or refused to produce the correspondence between its counsel and armor manufacturers, such as a dozen emails, and several letters, from the Weil Gotshal law firm to Armor Holdings. [4]

Point Blank also contends that Toyobo destroyed internal communications, claiming that Toyobo produced only a handful of internal emails from 2001 through 2003 and no internal emails.   (DE# 180, pp. 289-90).   They also say that Toyobo only produced 21 distinct internal emails from 2001, 7 of which were from the Zylon factory and were not sales or research related, and made an unreasonably modest production of internal emails for years 2002 – 2005.  Specifically, Plaintiffs say that:

    a.    Toyobo only produced 33 distinct internal emails from 2002, 20 of which were from the Zylon factory and were not sales or research related.

    b.    Toyobo only produced 27 distinct internal emails from 2003, 17 of which were from the Zylon factory and were not sales or research related.

    c.    Toyobo only produced 43 distinct internal emails from 2005, 8 of which were from the Zylon factory and were not sales or research related.

    d.    Toyobo did not produce any internal emails instructing employees to retain documents related to the Massachusetts Attorney General document request, the Second Chance document request, or United States Inspector General subpoena.

---

[4]    Point Blank alleges that Toyobo destroyed the vast majority of all email correspondence with Armor Holdings pre and post 2003.  More specifically, concerning Toyobo's primary contact at Armor Holdings, Mr. John Geshay, Point Blank contend that a keyword search of Toyobo's production using "Geshay" returns just 8 documents, 2 of which are in 2004 and none in 2005.  This does not, however, necessarily mean that correspondence was deleted.  It may simply mean that Toyobo employees followed the general advice to avoid emails concerning Zylon after November 2003.  *See, infra*, at Part V. Findings of Fact, ¶ 66, p. 40.

In addition, Plaintiffs complain that Defendants destroyed all evidence of the destruction by overwriting its servers.

Plaintiffs also say that Defendants did not notify Point Blank or any of the other parties who have investigated, subpoenaed, or filed suit against Defendants of the destruction of documents, including the United States.  Indeed, Plaintiffs contend that, until Point Blank raised the matters in this action, and even initially in this action, Defendants denied that any destruction took place.  To illustrate this, Plaintiffs refer to a May 3, 2010 letter from a Weil Gotshal lawyer, saying, "we have reviewed our production in this action and confirmed that Toyobo has produced all relevant and responsive documents from its files."

Plaintiffs also take the position that Toyobo made no effort whatsoever to compare the other productions it has in its possession from third parties to identify the missing documents.  Plaintiffs focus on the following exchange from the January 14, 2011 hearing:

> **THE COURT**: Well, when you say you haven't got a comparison, what would you be comparing?
>
> **MR. CAILTEUX**: [P]otentially what I could do is try to do the same thing that we did with Point Blank's production, is to print out all the emails in those other productions and then compare them to the emails we have in our databases. We just haven't done that yet.
>
> **THE COURT**: [P]roductions by Toyobo? Or productions to Toyobo?
>
> **MR. CAILTEUX**: No, Your Honor. It's productions to Toyobo. And if I could just expand a little bit to explain. This litigation is not the only litigation ongoing. There is a litigation going on still against Second Chance in Michigan, the trial is ongoing now. There is litigation involving, now, the Department of Justice. And there's also litigation involving First Choice. In all of those litigations, there have been productions. In the First Choice case, First Choice has produced documents. **So, theoretically, we could take the documents that First**

**Choice produced to us in the First Choice litigation, print those out and compare them to what we have internally at First Choice.** In the Department of Justice lawsuit, Armor Holdings is involved . . . Armor Holdings has made productions to the Department of Justice… **What we could potentially do after talking to Armor Holdings is print those documents out -- and, again, compare them to what we have internally to have some sense of what differences there may be.**

**THE COURT**: [Y]ou mentioned something about, well, we could take the production made by Second Chance and First Chance in this other litigation that they produced to us.  For example, they produced copies of emails. And we could take that production from them and compare it to what we have in-house to see if there's anything missing. Do I have that right?

**MR. CAILTEUX**: To see if there are differences, Your Honor.

**THE COURT**: To see if there are differences. And if there are, then, maybe, there would be something missing.

**MR. CAILTEUX**: Correct.

**THE COURT**:  Now, can you tell me, either way, one way or the other, whether Toyobo is missing, and therefore this material may have been destroyed, communications between Toyobo and the other manufacturers?

**MR. CAILTEUX**: I can't sit -- stand here today and tell you one way or the other.  (DE# 180, pp. 135-39) (emphasis added) (breaks in transcript not indicated).

In response to these factual assertions about destroyed evidence, the Toyobo Defendants essentially have several positions:  (1) there is no "widespread" destruction of evidence; (2) Plaintiffs have produced evidence of missing documents in only two categories; (3) Plaintiffs have their *own* copies of virtually all of the category one materials from their own files; (4) Plaintiffs obtained the communications in the second category from other body armor manufacturers; (5) the Point Blank Plaintiffs *assume* that additional e-mails are missing but have no evidence to support this theory; (6) Toyobo created few internal e-mails after November 2003 because the employees were instructed

to avoid written communications after that point; (7) Toyobo produced the underlying information at issue in the missing documents through duplicate communications or other production discussing the same data; (8) if any Zylon-related documents were not preserved after November 2003, they concerned only insubstantial matters; (9) Defendants produced hundreds of thousands of pages of documents to the Point Blank Defendants in discovery; and, (10) Toyobo did not act in bad faith.[5]

Toyobo also asserts several additional arguments challenging the legal basis of Plaintiffs' allegations. Specifically, Defendants contend (1) that they did not reasonably anticipate litigation **with Point Blank** until December 2006; (2) that Point Blank regularly and continually made public comments supporting the use of Zylon in their products (thereby eliminating an anticipation of litigation with the Point Blank Plaintiffs); (3) that Plaintiffs cannot rely upon a preservation duty running to others; (4) that there is no "industry wide" anticipation of litigation theory which Plaintiffs can use to generate a preservation duty against Toyobo in 2003; and (5) that sanctions cannot be awarded under any construction of the facts because the missing information is not critical to Plaintiffs' case.

Additionally, Toyobo contends that it did implement a litigation hold in November 2003, but disagrees with Plaintiffs over the scope of the hold, whether the duty which created the need for that litigation hold flowed specifically to the Point Blank

---

[5]     Toyobo concedes that "there may have been some confusion about the exact scope and types of documents that needed to be retained going forward." (DE# 236-1, p. 10, n. 9). As outlined in greater detail below in the Court's Findings of Fact, this concession is amply demonstrated in the record. Toyobo would have appeared disingenuous if it had tried to deny the confusion associated with an oral litigation hold concerning a multi-page list of documents which was never distributed to the employees who were supposed to locate the discovery materials.

Plaintiffs or whether Plaintiffs can rely upon (or "piggy back," to use Defendants' terminology) a duty owed to *others* in related litigation and investigations.  The parties take significantly different positions on when Toyobo's duty to preserve began vis-à-vis Point Blank.  Point Blank contends that Toyobo's duty to preserve arose in November 2003 because, according to Point Blank, that is when Toyobo anticipated litigation with Point Blank.  Toyobo, however, contends that the duty to Point Blank did not arise until December 2006 at the earliest.  The parties extensively and forcefully briefed this issue and submitted supplemental memoranda focusing on this specific question.

Toyobo also emphasizes Point Blank's post-2003 conduct to bolster its argument that it did not reasonably anticipate litigation with Point Blank until December 2006.  Specifically, Toyobo notes that other body armor manufacturers -- including Point Blank -- told Toyobo that they remained confident in the performance of their Zylon-containing body armor.  (DE# 180, pp. 49, 114).  These other companies, including Point Blank, made public statements that their Zylon-containing body armor was safe.  (DE# 180, pp. 8-12, 33, 49).[6]

Indeed, Point Blank repeatedly assured its customers that the issues being raised about Zylon-containing vests were limited to Second Chance vests and that Point Blank's Zylon-containing vests were safe.  Point Blank made these same representations directly to Toyobo.

---

[6]     In a November 20, 2003 e-mail, for example, a Point Blank employee forwarded a Zylon Position Statement, intended to be forwarded to law enforcement clients, which explained that Zylon "is one of the strongest fibers in the world" and that, after its own testing and Toyobo's findings, "Point Blank continues to have highest degree of confidence in our products."  (DE# 237-11).

Additionally, in response to concerns about Zylon as a result of the Second Chance vest failure, Point Blank investigated the ballistic performance of its armor systems, both those that contained Zylon and those that did not contain Zylon. The results of this testing were included in the DHB Armor Group Armor Safety Report released to the public on August 1, 2004. *See* DHB Armor Group Armor Safety Report ("Armor Safety Report") (DE# 237-29, p. 3). In the Armor Safety Report, Point Blank concluded that it "discovered no safety issues with Zylon® (PBO) hybrids manufactured by Point Blank and PACA as a result of [its] testing." Point Blank never retracted or amended the Armor Safety Report, nor did it ever indicate that subsequent testing showed that there were issues with Point Blank's Zylon-containing vests.

## V.  GENERAL PRINCIPLES OF E-DISCOVERY AND SANCTIONS FOR SPOLIATION

1.      There is always "a pervasive risk that electronic information will be lost during the course of litigation, whether through inadvertence, intentional spoliation or failure to institute and properly implement a litigation hold." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 431 (S.D.N.Y. 2010).

2.      In a diversity lawsuit such as this one, federal law governs the imposition of spoliation sanctions because they constitute an evidentiary matter. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Although federal law governs, the Court may look to state law for guidance to the extent that it is consistent with federal law. *Managed Care Solutions*, 736 F. Supp. 2d at 1322.

### *Spoliation*

3.     Spoliation refers to the destruction of evidence or the significant and meaningful alteration of a document or instrument.  *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.,* 341 F.3d 1292, 1308 (11th Cir. 2003).  But it is also defined as the "*intentional* destruction, mutilation, alteration or concealment of evidence, usually a document."  *Calixto,* 2009 WL 3823390, at *13 (emphasis added) (citing Blacks Law Dictionary 1437 (8th ed. 1999).  *See also Southeastern Mech. Servs, Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. July 24, 2009) ("the intentional destruction or concealment of evidence").

4.     The courts in this circuit have not always been consistent in providing a definition of "spoliation."  Some definitions include the word "intentional," while others do not.[7]  Because the Eleventh Circuit's decision in *Green Leaf Nursery* did not include "intentional" in its definition of the destruction of evidence requirement for spoliation, the Court will not include that requirement.  341 F.3d at 1308.

5.     In meeting the requirement to demonstrate that the spoliated evidence was **crucial** to the movant's ability to prove its *prima facie* case or defense, it is not enough that the spoliated evidence would have been relevant to a claim or defense.  *Managed*

---

[7]     For example, the "intentional" component *is* included in the spoliation definitions in *Optawave Co., Ltd. v Nikitin*, No. 6:05-CV-1083-Orl-22DAB, 2006 WL 2321422 (M.D. Fla. Nov. 7, 2006), *Southeastern Mechanical Servs.*,  2009 WL 2242395, and *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390 (S.D. Fla. Nov. 16, 2009).  The "intentional" factor is not included in *Graff v. Baja Marine Corp.,* 310 F. App'x. 298 (11th Cir. 2009).   *Graff*, however, is a "not for publication" opinion based, in part, on Georgia law.  On the other hand, there is no "intentional" requirement found in the court's spoliation definition in *Corporate Financial, Inc. v. Principal Life Insurance Co.*, No. 05-20595-CIV, 2006 WL 3365606 (S.D. Fla. Nov. 20, 2006).

*Care Solutions*, 736 F. Supp. 2d at 1327-28 (finding that the allegedly spoliated evidence was not crucial to the plaintiff's claims because it could still prove its case through other evidence already obtained elsewhere).  *See also Floeter v. City of Orlando,* 6:05-cv-400-Orl-22KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (missing emails may be relevant to Plaintiff's case but they were not critical and would have been cumulative).[8] Parties are permitted to ask the trial courts to permit them to introduce into evidence at trial the circumstances surrounding their opposition's failure to retain and produce evidence, including emails, even when the trial court rejects the request for an adverse inference jury instruction.  *Managed Care Solutions,* 736 F. Supp. 2d at 1334.

### *Sanctions & Spoliation Sanctions*

6.       A court has broad discretion to impose sanctions for litigation misconduct based on its inherent power to manage its own affairs.  A finding of bad faith, however, is required to impose sanctions based upon the court's inherent power.  *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).

7.       The district court has broad discretion to control discovery, including the ability to impose sanctions on uncooperative litigants.  *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993).

8.       Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process.  *Gratton v. Great Am. Commc'ns,* 178 F.3d 1373 (11th Cir. 1999).

---

[8]       In the Second Circuit, in contrast, the destroyed evidence must be shown to have been "helpful" in proving a claim a defense – i.e. that the innocent party is prejudiced without that evidence.  *Pension Comm.,* 685 F.Supp. 2d at 467. That burden of showing the loss of "helpful" evidence is significantly less than the Eleventh Circuit requirement of establishing that the spoliated evidence would have been *crucial.*

9.    In this circuit, sanctions for spoliation of evidence may include "(1) dismissal of the case [or default judgment against defendant]; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a presumption against the spoliator." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005). *See also Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962 (S.D. Fla. July 23, 2010).

10.    In the instant case, Plaintiff urges the third type of sanction -- imposition of an adverse inference. But there are different types of adverse inferences, ranging in differing and ever-increasing levels of harshness. One type results in a jury being instructed that certain facts are deemed admitted and must be accepted as true. Another type results in the imposition of a mandatory, albeit rebuttable, presumption. A third type permits a jury to presume that the lost evidence is relevant and favorable to the innocent party. With this third type of adverse inference, the jury also considers the spoliating party's rebuttal evidence and then decides whether to draw an adverse inference. *Pension Comm.*, 685 F. Supp. 2d at 470.

11.    The plaintiff, as the moving party on a spoliation motion, has the burden of proof. "[T]he party seeking [spoliation] sanctions must prove . . . first, that the missing evidence existed at one time; second, that the alleged spoliator had a duty to preserve the evidence; and third, that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Walter*, 2010 WL 2927962, at *2 (citing *Floeter*, 2007 WL 486633, at *5). *See also Managed Care Solutions*, 736 F. Supp. 2d at 1322.

### *Bad Faith Requirement*

12.    But even if all three elements are met, "[a] party's failure to preserve evidence" rises to the level of sanctionable spoliation in this Circuit "only where the absence of that evidence is predicated on **bad faith**," such as where a party purposely "tamper[s] with the evidence." *Bashir v. AMTRAK,* 119 F.3d 929, 931 (11th Cir.1997) (emphasis added). *See also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.* 318 F.3d 1284, 1294 (11th Cir. 2003) (no adverse inference from missing label because there was no indication of bad faith).

13.    Although the Eleventh Circuit indicated in *Flury* that bad faith is only **a** factor to consider under Georgia spoliation law, 427 F.3d at 945, *Flury* does **not** stand for the proposition that bad faith is not required in this circuit for an adverse inference jury instruction based on spoliation of evidence under Florida law.  Several reasons support this conclusion.  First, *Flury* construed Georgia spoliation law (not Florida spoliation law).[9]  Second, *Flury* was "a panel decision and as such did not overrule the prior panel decision in *Bashir*, requiring a showing of bad faith." *Managed Care Solutions.*, 736 F. Supp. 2d at 1328, n.16 (noting that only the Supreme Court or an *en banc* decision from the Eleventh Circuit can judicially overrule a prior panel decision).  Third, in several cases following the 2005 *Flury* decision the Eleventh Circuit specifically and unequivocally held that bad faith **is** required for an adverse inference instruction as a sanction for spoliation. *See, e.g.*, *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1310 (11th Cir. 2009) (noting that a showing of malice is not required to find bad faith but emphasizing that an adverse inference can be "drawn from a party's failure to preserve

---

[9]    In *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008), the court stated that "since *Flury*, bad faith is only one factor to consider").

evidence **only** when the absence of that evidence is predicated on bad faith") (emphasis added); *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) ("a jury instruction on spoliation of evidence is required only" when bad faith is responsible for the absence of the evidence); *BP Prods. N. Am., Inc. v. Southeast Energy Grp., Inc.*, 282 Fed. App'x 776, 780 n.3 (11th Cir. 2008) (holding that an adverse inference presumption was appropriate where the district court implicitly determined that the defendant's actions were predicated on bad faith).

14.    Phrased differently, mere negligence in losing or destroying records or evidence are insufficient to justify an adverse inference instruction for spoliation.  *Bashir*, 119 F.3d at 931.  The Eleventh Circuit's rule precluding an adverse inference in the face of simple negligence is that "it does not sustain an inference of consciousness of a weak case."  *See also Slattery v. Precision Response Corp.* 167 F. App'x 139, 141 (11th Cir. 2006).

15.    Given this Circuit's requirement that an adverse inference flowing from spoliation requires the presence of bad faith, even **grossly negligent** discovery conduct does not justify that type of jury instruction.  *Preferred Care Partners Holding Corp.*, 2009 WL 982460 at *7 (declining to order adverse inference even though party's performance in fulfilling discovery obligations was "clearly egregious" and even though the party's discovery failings "resulted from the grossly negligent oversights of counsel").[10]

---

[10]    In other Circuits, however, there are district court judges who have ordered adverse inference jury instructions of the rebuttable presumption type for spoliation of e-discovery when the spoliating party did not act willfully but acted only in a grossly negligent manner. *See, e.g., Pension Comm.*, 685 F.Supp. 2d at 456. *See also Vodusek v.*

16.     Because this Circuit, unlike some others, requires bad faith before permitting an adverse inference jury instruction when there is spoliation of evidence, courts deny the requested instruction when no bad faith is shown.  *Slattery*, 167 F. App'x at 141 (employer's failure to produce documents did not justify an adverse inference because plaintiff had demonstrated "no evidence [of withholding] or tampering with any of the documents in bad faith").  *See also Penalty Kick Mgmt.,* 318 F.3d at 1293-94 (no evidence of bad faith in losing label at issue in lawsuit alleging improper disclosure of trade secrets).  In fact, district courts in our Circuit regularly deny adverse inference requests even when there is an indisputable destruction of evidence.  *Socas v. Northwestern Mut. Life Ins. Co.*, No. 07-20336, 2010 WL 3894142 (S.D. Fla. Sept. 30, 2010) (denying motion to dismiss and for adverse inference jury instruction when doctor negligently failed to suspend her ordinary policy of purging inactive patient files after learning the information in those files was relevant to her disability claim); *Managed Care Solutions,* 736 F. Supp. 2d at 1332; *Walter*, 2010 WL 2927962 (missing broken deck chair in lawsuit for injuries sustained when plaintiff's deck chair collapsed while he was a cruise ship passenger); *Atlantic Sea Co.,* 2010 WL 2346665 (failure to preserve spotlight and electrical wiring); *Calixto,* 2009 WL 3823390, at *14-17 (missing emails).  *See also United States v. Barlow*, 576 F. Supp. 2d 1375, 1381 (S.D. Fla. 2008) (loss of PVC marker used to identify the location of a ship's grounding in a lawsuit brought by the government for damage to underwater sanctuary resources when defendant's boat ran aground).

---

*Bayliner Marine Corp.*, 71 F. 3d 148, 156 (4th Cir. 1995) (bad faith is not a prerequisite to an adverse inference instruction).

***Duty to Preserve***

17.     Rule 37 also authorizes the imposition of sanctions for failure to comply with the court's rules.  Rule 37(e), which took effect in 2006, provides that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."  However, the notes explain that "good faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information, if that information is subject to a preservation obligation."  Fed. R. Civ. P. 37, advisory committee notes to 2006 amendments.

18.     Once a party files suit or reasonably anticipates doing so, however, it has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant to the dispute.  *Peskoff v. Faber,* 251 F.R.D. 59, 62 (D.D.C. 2008).  A party has an obligation to retain relevant documents, including emails, once litigation is reasonably anticipated.  *Managed Care Solutions,* 786 F. Supp. 2d at 1324.  *See also* Fed. R. Civ. P. 37, advisory committee notes to 2006 amendments ("When a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a 'litigation hold.'").

19.     Once a party reasonably anticipates litigation, it has an obligation to make a conscientious effort to preserve electronically stored information which is relevant to the dispute.  *Southeastern Mech. Servs*, 2009 WL 2242395, at *2.  *See also Managed Care Solutions,* 736 F. Supp. 2d at 1324.  *See generally Pension Comm.*, 685 F. Supp. 2d

at 461 (counsel must take necessary steps to collect, review and produce records to the opposing party when litigation is reasonably anticipated).

20.     Identifying the boundaries of the duty to preserve evidence involves two related inquiries: *when* does the duty to preserve evidence attach and *what* must be preserved.  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("*Zubulake IV*").

21.     Courts frequently ask two additional questions when analyzing whether a litigant satisfied the preservation requirements: *how* must a party preserve evidence and *who* is responsible for making sure that the obligation is met?

22.     Concerning the *when* question, the duty to preserve evidence arises when a party *reasonably anticipates litigation*.  Once a party reasonably anticipates litigation, then it "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.  *Pension Comm.*, 685 F. Supp. 2d at 466.  *See also Zubulake IV*, 220 F.R.D. at 218.  *See generally Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008).

23.     As for the *what* issue, parties are well advised to "retain all relevant documents (but not multiple identical copies) in existence at the time the duty to preserve attaches."  *Zubulake IV*, 220 F.R.D. at 218.  But determining what constitutes an "identical" copy which need not be retained is not always a simple analysis.  For example, there may be multiple copies of an email, all containing the same text, but the emails may not have been sent to the same recipients.  Because it might be important in the litigation to identify the persons who actually received an email, it might be necessary to preserve all (or at least more than one) copies of the email.

23

24.     The "relevant" documents which must be retained and preserved means "relevance, for purposes of discovery," which is "an extremely broad topic." *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004).

25.     Concerning the *how* issue, a litigation hold must be implemented -- and affirmative steps must be taken to monitor compliance "so that all sources of discoverable information are identified and searched." *Orbit One*, 271 F.R.D. at 437 (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("*Zubulake V*"). After that, the duty to preserve persists through the discovery process and litigants must ensure that all potentially relevant evidence is retained. *Zubulake V*, 229 F.R.D. at 432-33. *See also R.F.M.A.S., Inc. v. So,* No. 06 Civ. 13114(VM)(MHD), 2010 WL 3322639, at *6 (S.D.N.Y. Aug. 11, 2010).

26.     A duty to preserve evidence *in general* has existed in this district for many years. *See, e.g., Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107 (S.D. Fla. 1987) (granting default judgment against defendant in antitrust case for flagrant and willful destruction of documents covered by discovery requests). However, "no court in the Eleventh Circuit articulated a 'litigation hold' requirement [for e-discovery] until 2007." *Pension Comm.*, 685 F. Supp. 2d at 477, n.90. *See In re Seroquel Prods. Liab. Litig.,* 244 F.R.D. 650, 663 (M.D. Fla. 2007) (adopting the Southern District of New York's litigation hold requirement). According to U.S. District Judge Shira Scheindlin, the failure to institute a written litigation hold in early 2004 in a case brought in federal court **in Florida** was on the borderline between a well-established duty and one that was not yet generally required. *Pension Comm.*, 685 F. Supp. 2d at 477, n.90. Therefore, for purposes of federal court litigation in Florida after August 21, 2007, Judge Scheindlin

requires an ESI litigation hold concept. For Florida federal cases before August 21, 2007, Judge Scheindlin explained in *Pension Committee,* courts will need to look at specific facts to determine the existence and/or degree of culpability for destroyed evidence.[11]

27.     The *who* issue is straightforward: "The preservation obligation runs first to **counsel**, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 197-98 (S.D.N.Y. 2007) (quotations omitted) (emphasis added). *See also Zubulake V,* 229 F.R.D. at 433 (explaining that "active supervision of counsel" is especially important for preserving ESI).

28.     In a business setting, the managers, in turn, are responsible for conveying to the employees the requirements for preserving evidence. *Chan v. Triple 8 Palace, Inc.,* No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, at *6 (S.D.N.Y. Aug. 11, 2005).

## VI.     FINDINGS OF FACT

### *General Background*

29.     On June 23, 2003 an officer in Forest Hills, Pennsylvania was shot and the bullet penetrated a 100% Zylon vest manufactured by Second Chance Body Armor.

---

[11]     Had this case been governed by New York law, at least as interpreted by Judge Scheindlin, the failure to issue a written litigation hold after July 2004 "constitutes gross negligence because that failure is likely to result in the destruction of relevant information." *Pension Comm.,* 685 F. Supp. 2d at 464.

Because the Eleventh Circuit requires bad faith before imposing an adverse inference jury instruction for spoliation, the negligent or grossly negligent failure to timely and adequately implement a litigation hold will not, by itself, support the inference of bad faith. *Managed Care Solutions*, 736 F.Supp. 2d at 1328-1329 (acknowledging defendant's negligent failure to issue a litigation hold but rejecting request for adverse inference instruction).

Defs.' Ans. ¶ 63 ("Toyobo Co. and Toyobo America admit that Officer Limbacher was shot on June 23, 2003 while wearing a 100% Zylon vest manufactured by Second Chance, and that Officer Limbacher survived the incident. Toyobo Co. and Toyobo America further admit that Officer Limbacher's vest was less than one year old at the time of the incident.").  (DE# 180, p. 50).

30.    On or about October 6, 2003 Defendants' retained public relations firm APCO worldwide to assist Defendants and their counsel with "possible litigation concerning Zylon fiber" and "litigation communications, strategic counseling, and reputation management support in connection with possible litigation concerning Zylon." The retention was not limited to litigation with respect to any particular armor manufacturer, weaver or the Department of Justice, but rather Zylon in general.  No litigation had commenced against Defendants as of that date.  (DE# 239-10).

31.    Beginning in November, 2003, Defendants were sued across the country in numerous cases involving Zylon-containing vests.  1st Amend. Compl. ¶3, Ans. ¶3 (DE# 239-11A).

32.    On November 18, 2003, the United States Department of Justice began its investigation into Zylon-containing body armor in the United States.  (DE# 180, p. 50); (DE# 239-12).

33.    In November, 2003, Defendants' counsel sent a list of documents it wanted Defendants to gather and provide to counsel.  That list of "Toyobo Documents To Be Collected In Connection With Litigation" directed Defendants to collect, among other categories of documents, "all correspondence, including emails, letters, memoranda, spreadsheets, charts, or other written information, between Toyobo and bullet-resistant

vest manufacturers."   Defendants admitted that the specific list of documents to be collected encompassed ***all manufacturers***, not just one.

34.     This counsel-prepared list, however, is not a "litigation hold."  It does not instruct Toyobo to retain and not to delete the documents collected, nor does it provide a specific directive not to destroy future emails and other documents concerning the same subjects.  In fact, Magistrate Judge John O'Sullivan, who previously handled the magistrate judge duties on this case, concluded at a discovery hearing that the list "is not a litigation hold letter."  Instead, as described by Judge O'Sullivan, it is "just a letter from an attorney telling his client to provide certain documents that he thinks will be relevant to a lawsuit."  (DE# 239-30, p. 37).

35.     At approximately the same time that this list was sent, Defendants contend that Toyobo implemented a "New Document Retention Policy" to preserve documents. Mr. Masakazu Saito, the General Manager of the Zylon Department, testified that "I believe it was in late November [2003] that the new document retention policy was instituted." (DE# 180, p. 34); (DE# 239-15).

### Confusion Over the November 2003 "Litigation Hold"

36.     At the evidentiary hearing, Toyobo produced **Mr. Masakazu Saito**, who was the General Manager of the Zylon Department when the "new" document retention policy was implemented (i.e., the time when Toyobo says it implemented a litigation hold).

37.     Mr. Saito testified that Toyobo was advised of the new document retention policy both orally **and in writing**.  (DE# 180, p. 21).  He also testified that he believed

Toyobo then passed on the litigation hold directive to its employees both orally and in writing.  (DE# 180, p. 78).

38.     However, Defendants concede that Toyobo "has been unable to locate any written notification regarding this new document retention policy which was put in place in November 2003."  (DE# 236-1).

39.     Not only have Defendants been unable to locate a written litigation hold from November 2003 (or for a few years thereafter), but their counsel have not advised the Court (through affidavit or otherwise) that they in fact provided a written litigation hold to their clients along with the list of documents "to be collected."

40.     Likewise, Defendants have submitted legal memoranda advancing the argument that a litigation hold need not be in writing and can be oral -- a position which implicitly concedes both that their counsel never issued written instructions for the client to implement a written litigation hold from November 2003 to February 2006 and that Toyobo did not itself pass on a litigation hold directive in writing to its employees until February 2006.  (DE# 236-1, p. 39).

41.     No copy of the purported "New Document Retention Policy" has ever been located.  Defendants conceded at the hearing, after listening to Mr. Saito's testimony, that they never located a written directive to the employees which would be covered by Mr. Saito's testimony.  (DE # 180, p. 82).

42.     Moreover, any new document retention policy put in place in November, 2003 likely did not encompass *future* correspondence with bullet-resistant vest manufacturers.   Mr. Saito's testimony on this point was uncertain and somewhat contradictory.  In fact, when first asked about this issue, Mr. Saito's answer was: "I think

my answer would have to be a bit vague." (DE# 180, p. 78). His subsequent testimony

demonstrates that he did not seem to focus on the need to preserve *future* documents:

> **THE COURT: Q**. All right. And while you're instructing the
> employees to save all communications up until that date in
> November of 2003, did you also say to them: And, by the way,
> make sure to preserve all future written communications, including
> emails regarding Zylon?
>
> **A.** Basically, I can say that there was no intent to make the
> instruction lax, but when it comes to later correspondences,
> correspondences past that date, there would have been -- important
> documents would have had the intercession or the attendance of
> attorneys, to begin with. And for that reason, <u>I think later
> correspondences would be of not much importance</u>. (DE# 180, p.
> 79) (emphasis added).

43.     But a minute after indicating that he did not place much emphasis on

preserving documents created after November 2003, Mr. Saito testified that he did, in

fact, give the "preserve-future-documents" instruction to his employees. (DE# 180, p.

80).

44.     Mr. Saito's testimony was also inconsistent on the issue of whether the

(apparently only oral) instructions to preserve communications related **solely to Second

Chance** (a vest manufacturer who filed a lawsuit against Toyobo) or to *all* bullet-resistant

manufacturers. Initially, after being reminded that the document list received from

counsel mentioned "all" correspondence with bullet-resistant vest manufacturers, Mr.

Saito testified that Toyobo did, in fact, try to preserve communications with all

companies, not merely those with Second Chance. (DE# 180, p. 77-78). But, a minute or

two later, he testified that there was a "focus" on the "Second Chance litigation" -- and

that it was "possible" that some employees "may have been less than very careful in

preserving correspondences with companies other than Second Chance." According to

Mr. Saito, the communications with other manufacturers were "not of much relevance, substance-wise." (DE# 180, p. 78).

45.      This testimony about trying to preserve communications with all companies is also inconsistent with Mr. Saito's earlier answer, when, in response to questioning by Toyobo's counsel, he agreed that he "didn't put a litigation hold for documents relating to manufacturers other than Second Chance." (DE# 180, p. 72). Mr. Saiko's testimony, therefore, is a classic illustration of flip-flopping.[12]

46.      Mr. Tadao Kuroki, who worked in sales and marketing for Toyobo from 2000 to the present also testified at the evidentiary hearing. (DE# 180, p. 87). Like Mr. Saito, he, too, testified about the "New Document Retention Policy:"

> **THE COURT: Q.** All right. And since you told me that this email was distributed to many people in Toyobo and different departments, do you have any idea why your company has been unable to find this written evidence of a new document retention policy?
>
> **A. I believe there is almost no one within the company who would, on a long-term basis, store emails. And I think that would be a reason.**
>
> **Q.** Except for the fact that the email, itself, said, "Please preserve all documents relating to litigation." So wouldn't that email, itself, be the type of document that was supposed to be preserved since it's telling people, save documents relating to litigation?
>
> **A.** That was not the understanding back then.
>
> **Q.** It strikes me as a little ironic that you have a -- have an email that's distributed throughout the company saying, please preserve all documents relating to litigation. It's very important that we preserve these documents. Yet the very email advising people to preserve documents wasn't preserved. That strikes me as somewhat ironic.

---

[12]      A "flip-flop" is a "sudden reversal (as of policy or strategy)." http://www.merriam-webster.com/dictionary/flip-flop?show (last visited Apr. 1, 2011).

**A.** Back then, all relevant documents had all been collected in a place that we refer to as our headquarters. And I think because that had been done, **people at the research centers and the plants probably felt that there was nothing further for them to do**. And I believe that may explain it.

**Q.** So if there was an email distributed throughout the company advising employees to preserve litigation documents, would that email then get automatically deleted from the inboxes of every employee who received it? Or would the employees have to, on their own, affirmatively delete it?

**A.** Individual employees would have to do the deleting act. **Even now**, when it comes to the **communication internally**, employees would **discard them once those communication emails are read**. (DE# 180, pp . 128-30) (emphasis added).

47.     In addition to claiming that an email mandating document preservation was distributed to the employees in November 2003 but was then *itself* deleted individually by *all* the employees who received it, Mr. Kuroki also testified that he thinks the list prepared by American counsel (designating the documents to be collected in connection with litigation) was **not** distributed to the employees. Asked how the employees would know what documents to save if the specific and comprehensive list itself was not forwarded, Mr. Kuroki testified that the understanding was that "Second Chance litigation-related materials, materials related to Zylon's properties and materials related to production" would have been preserved. In other words, communications with manufacturers other than Second Chance seem not to have been understood as subject to the oral litigation hold -- a recollection which differs with Mr. Saito's recollection (albeit a shifting recollection).

*Events Following the November 2003 Vague, Oral "Litigation Hold"*

48.     On January 9, 2004, Defendants were served with a Request for Production of Documents by the Massachusetts Attorney General for "Copies of all correspondence between Toyobo or Toyobo America and a) Second Chance; b) First Choice; c) Point Blank; d) U.S. Armor and e) any other light weight body armor manufacturer in the United States from 1993 to the present."   That case continued through December, 2004, when the federal court overseeing it entered an Order on December 23, 2004, transferring the case to the Western District of Michigan, where Second Chance filed bankruptcy.  The Massachusetts Attorney General subsequently filed a proof of claim in the bankruptcy court.

49.     On July 16, 2004, Defendants were served with a Request for Production of Documents in a Michigan state court proceeding which sought, "all documents referring or pertaining to or describing Toyobo's communication and contact with and/or between Zylon ballistic vest manufacturers, including all internal memos, email and documents referring or pertaining to such communications and contact."  That case was later removed from state court and transferred to the Western District of Michigan Bankruptcy Court, where it continued through 2011.  (DE# 239-24).

50.     Defendants' witnesses testified that they had no knowledge of litigation "about vests manufactured by Point Blank, by First Choice, by Armor Holdings, any of those other companies" (i.e., companies other than Second Chance) before 2006. The specific testimony includes:

**Kuroki Testimony:**

**Mr. Cailteux (counsel for Toyobo)**: **Q.** Now, Mr. Kuroki, **after November of  2003**, what was your understanding of what Toyobo's

policy was with regard to the retention of correspondence with manufacturers **other than** Second Chance?

**A.** Now that we had come to learn that any communication with Second Chance were not to be discarded, nevertheless, with respect to emails and communications with other manufacturers, that practice remained the same. In other words, it remained the same as it was before this November of 2003.[13]

**Q.** And was your understanding of that **because Toyobo didn't believe that there was going to be litigation involving this, other than Second Chance vests**?

**A. Yes, that's correct**. My understanding was that the new policy had been established as a litigation-related  policy. And I felt that **whatever was not related to the litigation, [we] will not need to pay any attention or care to that**.

(DE# 180, pp. 118-19) (emphasis added).[14]

**Saito Testimony**

**THE COURT:  Q.** If I heard you correctly just a minute ago, you said that you instructed the employees to -- to save or preserve or retain all emails from November 2003 and earlier?

**A.**  That is correct.

**Q.** Did you also give an instruction to the employees to retain future emails between Toyobo and bullet-resistant vest manufacturers?

---

[13]     This is another example of testimony which is inconsistent with Mr. Saito's position that he did, in fact, consider communications with *all* manufacturers, not merely those with Second Chance, to be encompassed by the litigation hold instructions.  To add to the confusion surrounding the specifics of the oral litigation hold, Defendants' Proposed Findings of Fact and Conclusions of Law say, "as a result of *discussions* with counsel, Toyobo implemented a new document retention policy in November 2003 focused on the risk of litigation concerning the use of Zylon *in Second Chance Vests*." (DE# 236-1, p. 9) (emphasis added).  This essentially confirms that the oral litigation hold established in November 2003 did **not** encompass communications with manufacturers other than Second Chance (unless those communications happened to also discuss Second Chance vests).

[14]     During an earlier part of the evidentiary hearing, Mr. Saito testified that Toyobo was not aware of any litigation by armor manufacturers other than Second Chance before 2006. (DE# 180, pp. 34-35).

**A.** Concerning this point, I think my answer would have to be a bit **vague,** and let me continue.  What I mean is that, for one, we had to be careful in this **post-November 2003 days** with the preparation of documents to begin with.  Secondly, there was a focus on the Second Chance litigation. And it's possible that among certain staff members they may have been **less than very careful in preserving correspondences with companies other than Second Chance**, which was **not of much relevance, substance-wise**.

**Q.** I may have done a bad job asking the question. So let me try it a different way.  In my mind, I'm going back to November of 2003. It's almost like I'm traveling back in time. And I see you, in November of 2003, instructing your employees to preserve all communications and emails concerning Zylon up until that point; that happened, correct?

**A.**  That's right.

**Q.** All right. And while you're instructing the employees to save all communications up until that date in November of 2003, did you also say to them: And, by the way, make sure to preserve all future written communications, including emails regarding Zylon?

**A.**  Basically, I can say that there was no intent to make the instruction lax, but when it comes to later correspondences, correspondences past that date, there would have been -- important documents would have had the intercession or the attendance of attorneys, to begin with. And for that reason, **I think later correspondences would be of not much importance**.

(DE# 180, pp. 78-79) (emphasis added).

\* \* \*

**Mr. Cailteux: Q. Is February 2006 the first time that Toyobo had received notice** that there may be **litigation over vests** using Zylon by manufacturers **other than Second Chance**?

**A.** That would be correct to say.

(DE# 180, p. 71) (emphasis added).

**Representations by Mr. Cailteux to the Court:**

> **Mr. Cailteux**: - from 2003, 2004, 2005, into 2006, **there's no indication that anybody is going to sue Toyobo about vests** manufactured by Point Blank, by First Choice, by **Armor Holdings**, any of those other companies . . . **So why is Toyobo going to expect that they're going to get sued about vests manufactured by other parties**, when there are actually lawsuits out there and the same -- the attorneys that brought that lawsuit had also been involved in the Second Chance case?  Their mindset was, we're not going to be sued about those other vest manufacturers.  And so, **again, it goes to the duty**. **Where is the knowledge that there may be litigation about those other vests**?

(DE# 180, pp. 218-19) (emphasis added).

51.     The testimony and representations above are inconsistent with the fact that Defendants and Armor Holdings were jointly sued in April 2004 in a class action seeking $77.5 million involving **all** Armor Holdings vests containing Zylon.  At that time, Armor Holdings and Point Blank were the two largest armor manufacturers in the United States.

52.     Defendants' current counsel represented Defendants in that 2004 class action.[15]  In an email among Defendants' counsel and Kent Jarrell, (Director of Litigation Communication, APCO Worldwide) titled, "List of Vest Manufacturers" counsel commented, "The suit against Armor Holdings, is obviously major news."  (DE# 239-2).[16]

---

[15]     Defendants' counsel has represented the Toyobo entities in all actions filed against them relating to Zylon in the United States since 2003.

[16]     Although this April 2004 class action lawsuit named Toyobo as a defendant and concerned vests manufactured by Armor Holdings, Toyobo contends that Point Blank's counsel previously explained, in another lawsuit pending in Massachusetts federal court, that this class action "had only to do with Second Chance vests." (DE# 236-1, p. 8, n.6).  Toyobo attaches an excerpt from a hearing transcript in the Massachusetts case where Point Blank's counsel said, in May 2010, that "all those lawsuits had only to do with Second Chance vests."  (DE# 237-7, p. 23).  But the Court cannot conclude for certain whether "those lawsuits" encompassed the 2004 class action or only the  lawsuits filed by state attorneys general.  Regardless of the comment made in an earlier proceeding by

53.     On August 10, 2004, Defendants were served with a subpoena from the United States requesting, "All records pertaining, referring, or related to communications with or about any vest manufacturer other than Second Chance concerning Zylon or vests made, at least in part, with Zylon."  (DE# 239-25).

54.     In its 2004 Annual Report, Toyobo stated in the litigation section that "In the U.S., lawsuits have been filed by users of bulletproof vests etc. against makers alleging that performance of the bulletproof vests is inadequate. The American bulletproof vest makers manufactured and sold the products using 'ZYLON' fiber, a product of the company."  (DE# 239-26).

55.     In January, 2005, Point Blank began the process of recalling its high Zylon content vests and issued a nationwide notice campaign the following month.  (DE#239-26).

56.     On August 24, 2005, the National Institute of Justice issued NIJ Body Armor Standard Advisory Notice #01-2005 indicating that it "identified . . . Zylon as a material that appears to create a risk of death or serious injury as a result of degraded ballistic performance when used in body armor."  NIJ decertified all Zylon-containing vests and no vest containing Zylon has since been certified by the NIJ. (DE# 239-28).

57.     At the July 22, 2010 discovery hearing before Judge O'Sullivan, Defendants' counsel represented to the Court:

---

Plaintiffs' current counsel or the context in which it was made, the lawsuit indisputably did, in fact, name vest manufacturers other than Second Chance.

Toyobo also contends that it would not have reasonably anticipated further litigation over Armor Holdings' Zylon-containing body armor because the lawsuit was settled in 2004 and Armor Holdings received $2 million worth of additional Zylon, as well as financial assistance to test its Zylon-containing body armor, which it continued to sell.

**Mr. Gibson**: The documents that we did produce to them show that our client had put in place litigation holds so the documents would not be discarded inadvertently that may be related to the litigation.

**The Court**: usually when you have a litigation hold someone in the company sends out an e-mail or a letter to everyone that says, "we've been, you know, sued by somebody and you need to maintain any documents regarding whatever the issue is." that didn't -- you're saying that doesn't exist.

**Mr. Gibson**: well, your honor, I'm saying that there [are] documents that exist that show e-mails that went out **later in time** where our client is reminding people to keep the documents that they need to keep -- or they need to keep that may be related to the litigation. **What we don't have is what they sent out initially.**  (DE# 89, p. 32) (emphasis added).

58.     The above representations are not necessarily supported by other evidence submitted to this Court.  First, as Toyobo now concedes, there were no written litigation holds in place before February 2006.  Moreover, the "later in time" documents do not on their face confirm the existence or scope of a litigation hold put in place in November 2003.

59.     The "later" documents referred to by Mr. Gibson appear to include a February 23, 2006 email from Mr. Saito to certain key Zylon Department employees. (DE# 114-1, Ex. C).  In this email, Mr. Saito mentions that Toyobo's attorneys forwarded a Department of Justice letter explaining that the federal government was investigating Zylon-containing vests manufactured by companies other than Second Chance. Toyobo's lawyers also forwarded a memorandum, explaining the significance of the DOJ letter. In this memorandum, the attorneys said the following: "While it is **likely** that most of these materials and documents have already been preserved because of the current ongoing Second Chance litigations, Toyobo should take steps to make sure that no documents or materials relating to Zylon used in vests manufactured by companies other than Second

Chance are inadvertently discarded or destroyed while the DOJ investigation is pending."
(DE# 114-1, Ex. B) (emphasis added).

60.     Apparently, this February 2006 memorandum is the first written communication from counsel to Toyobo, directing that a Zylon-related litigation hold be implemented.  It also appears to be the first time that counsel ever gave Toyobo written instructions to include communications with manufacturers other than Second Chance in the litigation hold.

61.     Mr. Saito, in turn, sent a memorandum to certain employees, directing them to "make sure that Toyobo people do not dispose of material or related documents pertaining to bulletproof vests used by users other than [Second Chance].  I **believe** that these documents, etc., were instructed to be retained at the time of the [Second Chance] litigation, but I am confirming and making this instruction once again."  (DE# 237-4, Ex. C) (emphasis added).

62.     Neither the memo from Toyobo's counsel nor Mr. Saito's email pinpoints a specific letter, memo, email, document, phone conference or other source of the communication which "likely" was sent in 2003 (or any other date before February 23, 2006).  The documents do not support Mr. Saito's "belief" that the instruction was previously given (i.e., given before February 23, 2006) for communications with users or manufacturers other than Second Chance.  Similarly, these documents do not specify the particular attorney who supposedly passed along the oral litigation hold in late 2003, nor do they provide any detail about the specifics of the earlier document preservation instruction.

63.     Toyobo contends that this email and the memorandum "confirm[]" that Toyobo had previously given document preservation instructions.   But the Court concludes that it is equally likely that these after-the-fact documents do not, in fact, confirm a prior litigation hold, nor do they confirm a hold for communications with users other than Second Chance.   Thus, it is just as possible (i.e., just as "likely") that the documents are self-serving materials designed to create a record of something which either had not happened, had not happened in the way Toyobo now contends or happened in a purely non-written, vague way.   As articulated at times by Mr. Saito at the evidentiary hearing, Toyobo was under a "preserve-all-communications-even-with-users-other-than-Second-Chance" oral litigation hold as of November 2003, but this view is not fully supported by the hearing testimony of Mr. Saito and Mr. Kuriko.   Indeed, as noted, their testimony sometimes contradicts this position -- as does Mr. Saito's own testimony, which sometimes acknowledged the limited, "Second Chance only" scope of the November 2003 litigation hold.

64.     Further, to the extent Toyobo even instructed employees to *preserve* any documents in November 2003 (as opposed to finding and collecting), that instruction seems to have concerned documents related only to litigation with Second Chance. Although Mr. Saito said that communications with all manufacturers were covered by the litigation hold, he also agreed under oath with the statement that "Toyobo didn't put a litigation hold for documents relating to manufacturers other than Second Chance." (DE# 180, p. 72).  Similarly, Mr. Kuroki testified that the new retention policy put in place in November 2003 concerned only documents related to Second Chance litigation.  (DE# 180, p. 113).

65.     Given this testimony, the Court cannot blindly accept Toyobo's argument that the February 2006 memo and email "confirm" a prior instruction to preserve evidence (which includes communications with manufacturers other than Second Chance).

### Steps Taken by Toyobo to Preserve Evidence

66.     However, it is clear that the Toyobo Defendants did take *some* steps to preserve evidence beginning in November 2003.   The Court received evidence demonstrating that Mr. Saito instructed Toyobo employees to exercise **caution** before preparing any new documents relating to Zylon or the use of Zylon in ballistic applications, and to consult counsel before creating or sending Zylon related documents, due to the potential legal significance of such documents.  (DE# 180, pp. 78-79, 125).  In addition, Toyobo refers to an April 6, 2004 internal Toyobo communication, which, in effect, suggests to the Zylon staff to use the phone as primary means of communicating. (DE# 237-36).  According to Toyobo, this memorandum confirms the policy to avoid written communications after November 2003 and explains why there are comparatively few emails after the November 2003 "litigation hold."[17]

67.     In addition to the informal adoption of a policy favoring oral communications concerning the Zylon litigation, Toyobo (through  Mr. Saito) tasked Mr. Tadao Kuroki and Mr. Yoshinari Ohira with overseeing and coordinating the collecting and copying of documents potentially relevant to litigation involving Second Chance's use of Zylon in its vests.  (DE# 180, pp. 57, 105, 108-13).

---

[17]     This memorandum *also* says, "[t]his is a small organization and **communication means everything**."  (emphasis added).  Given the differing understandings about the so-called November 2003 litigation hold and the absence of any written communications expressly imposing a hold or even referring to it, this statement is, to say the least, ironic.

68.     The unrebutted record evidence presented to the Court is that Mr. Kuroki and Mr. Ohira collected Zylon-related documents located at all of the relevant locations within Toyobo, including at the production plant in Tsuruga, the Research Center in Katata, Ohtsu, and the head office in Osaka.  (DE# 180, pp. 56-57, 108).  This effort included searches for responsive documents in electronic and hard copy files at all of these locations within Toyobo.  *Id.* at 57-58.

69.     The materials Toyobo collected included documents about Toyobo's development and testing of Zylon fiber, documents evaluating Zylon's use in various applications (including ballistic applications), communications regarding Zylon, brochures and technical manuals, and documents regarding a new fiber that was researched and developed by certain members of the Zylon Department.   Toyobo copied the collected documents and sent them to counsel.  (DE# 180, pp. 58, 111-13). The documents that existed and were collected beginning in November 2003 have been preserved and still exist to this day.  (DE# 180, pp. 58, 112-13). Toyobo has represented that it produced all relevant documents from that collection to Point Blank in this case. Saito Decl. at ¶ 14. (DE# 237-4).

### *No Intentional Destruction of Evidence*

70.     The Court has not received any evidence that Mr. Saito ever intentionally destroyed, or ordered any Toyobo employees to destroy, documents he believed could be related to the use of Zylon fiber in ballistic vests.  (DE# 180, p. 75).  Similarly, the Court has not received any evidence that Mr. Kuroki ever destroyed, and was never instructed to destroy, any documents he believed to be relevant to Zylon litigation.  *Id.* at 119.  Nor is there any evidence in the record that Mr. Kuroki ever instructed any Toyobo

employees to destroy documents that he believed could be relevant to the Zylon litigations.

### Missing Laboratory Notebook

71.     Among the documents that were collected and produced to Point Blank in this case are eighty-one laboratory notebooks related to Toyobo's early research of Zylon (at the time known as "PBO") fiber from 1991 through 1996.  (DE# 127, at 13). However, Toyobo has not been able to locate volume 6 of researcher Hiroshi Hirahata's notebooks, which was authored in 1995.  (DE# 180, p. 164).  When Mr. Hirahata was transferred from the Research Center to a different position within Toyobo in 1997, his laboratory notebooks  (including volume 6) remained at the Research Center.  (DE# 237-9, p. 70-71).[18]  Mr. Hirahata does not know what happened to his notebooks after he left the Research Center in 1997, and Toyobo never maintained access logs relating to the laboratory notebooks.

72.     Point Blank has introduced no evidence concerning when laboratory notebook volume 6 went missing, which means no evidence that it went missing after the fall of 2003.  Additionally, Point Blank has produced no evidence through testimony or documents that laboratory notebook volume 6 contained any information that is crucial – or even relevant – to Point Blank's claims in this case; none of Mr. Hirahata's other

---

[18]     Mr. Hirahata gave a deposition in a separate action brought by the United States, *United States v. Toyobo Am., Inc.*, No. 1:07-CV-01144 (D.D.C., filed June 26, 2007).  Pursuant to a stipulation between the parties, that deposition can be used in this action as if it were taken in this action.  *See* Stipulation Regarding Use of Deposition (DE# 92).  Although Point Blank had the opportunity to take Mr. Hirahata's deposition in this case and to ask additional questions regarding laboratory notebook volume 6, it chose not to do so.

notebooks, all of which have been produced to Point Blank, make any reference to volume 6. (DE# 180, pp. 165-67, 257-58); Hirahata Dep. (DE# 237-9, pp. 118-27).

## VII.   CONCLUSIONS OF LAW

### A.   The Existence of the Evidence

To pursue its spoliation claim, Point Blank "must *at a minimum* point to some *facts* indicating that [the evidence allegedly destroyed] exists." *Epstein v. Toys-R-Us Del., Inc.*, 277 F. Supp. 2d 1266, 1277 (S.D. Fla. 2003); *see also Calixto*, 2009 WL 3823390, at *16 (noting that a party seeking spoliation sanctions must show that "evidence *once existed* that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case") (emphasis added); *Wilson v. Wal-Mart Stores, Inc.*, No. 5:07-CV-394-OC-10GRJ, 2008 WL 4642596, at *3 (M.D. Fla. Oct. 17, 2004) ("A party seeking an adverse inference or presumption as a sanction for spoliation of evidence must show that the evidence existed at one time . . .").

The Court cannot simply *assume* that, because Point Blank is in possession of certain e-mails between Toyobo and Point Blank that Toyobo did not produce in this case, that other e-mails between the companies or internal Toyobo emails must have existed and were not produced. *See, e.g., ACORN v. County of Nassau*, No. CV 05-2301, 2009 WL 605859, at *6 (E.D.N.Y. Mar. 9, 2009). Rather, it is Point Blank's burden to produce some evidence that the documents it alleges are missing actually existed at one time. *Epstein*, 277 F. Supp. 2d at 1277.

Aside from a single laboratory notebook that was created fifteen years ago, the only documents Point Blank has been able to show existed at one time but were not produced by Toyobo are correspondence between Toyobo and certain body armor

manufacturers, including Point Blank.  Virtually all of those documents, however, are admittedly now in Point Blank's possession.  To be sure, Plaintiffs obtained many of those documents from their own files or from the files of other body armor manufacturers, and not from Toyobo, but Plaintiffs have them nonetheless.

The parties have not called the Court's attention to a case which addresses the issue of whether a party seeking spoliation sanctions meets the first prong of the spoliation test -- showing that the missing evidence existed at one time -- if the evidence is located *elsewhere* and provided to movant.  Under this atypical scenario, the fact that Point Blank obtained virtually all of the documents elsewhere demonstrates, at a minimum, that the evidence "existed" at one time -- but is the evidence "missing" if it is *found* elsewhere?

Plaintiffs are legitimately upset, annoyed and agitated that *Toyobo* did not produce many of the documents and emails subject to discovery requests, but Plaintiffs obtained virtually all of the material not produced by Toyobo from *other* sources.

Therefore, there were documents and e-mails "missing" from Toyobo's *production*, but Point Blank has not provided legal authority to establish that the "missing" requirement is met when evidence that is not produced in discovery by a party under a duty to do so is located elsewhere by the party seeking discovery.

Common sense dictates that evidence obtained elsewhere cannot be "missing" and that an adverse inference instruction (intended to compensate a party for wrongly discarded evidence) is inappropriate when the evidence is in the plaintiff's possession and can be presented to the jury.  If Point Blank now has virtually all of the relevant evidence (albeit obtained from its own files or the files of parties other than Toyobo), then how can

a jury be given an adverse inference about destroyed, missing evidence if the parties can, in fact, introduce that very evidence at trial?  A jury would surely be confused if given an adverse inference instruction about destroyed or missing evidence if Point Blank introduces the very evidence it says is missing because Toyobo destroyed it.

Because Point Blank fails to establish other key elements of the spoliation claim (i.e., relevancy and bad faith) the Court need not decide whether evidence is "missing" if a litigation party failed to produce it but the purported victim of the discovery shortfall obtained the evidence elsewhere or had it in its own possession.  However, Plaintiffs' theory for an adverse inference lacks logical consistency and would, in any event, generate significant practical problems at trial because a jury instruction would likely be puzzling and confusing.

**B.      Defendants' Duty to Preserve Evidence**

The parties vigorously debate the facts concerning this component of the spoliation claim requirements as well as the scope of Toyobo's preservation duty.

Plaintiffs contend that Toyobo was under an evidence-preservation duty by November 2003, due to the government investigation.  In addition, they say that other lawsuits (primarily involving Second Chance, another major manufacturer of Zylon-containing armored vests) led Toyobo to reasonably anticipate litigation with Point Blank in 2003 or 2004.  They also contend that Toyobo anticipated litigation with Point Blank because a general duty to preserve is created when a party is aware that **industry-wide** litigation is reasonably foreseeable.  And Point Blank points to Toyobo's own privilege

logs, which list documents as early as December 2003, as evidence of Toyobo's anticipation of litigation.[19]

Toyobo contends that no duty to anyone existed before November 2003, that an early duty to preserve arose toward Second Chance, that it had no inkling that Point Blank would pursue a claim until December 2006 because Point Blank continued to tout the merits of Zylon and that there is no industry-wide litigation theory applicable in this Circuit which would generate a duty in favor of Plaintiffs.

As an initial matter, Toyobo could not have reasonably anticipated litigation with *anyone* involving the use of its Zylon fiber in ballistic applications before November 2003, when the first lawsuit was filed relating to Second Chance Body Armor's Zylon-containing vests.  Thus, to the extent that Toyobo discarded any documents related to Zylon *before* November 2003, Toyobo cannot be sanctioned for such destruction because it was under no duty to anyone to preserve those documents.

In evaluating Toyobo's duty to preserve documents related to Zylon after November 2003, the Court believes that those documents must be segregated into three broad categories:  (1) documents relating to Zylon generally; (2) documents specifically relating to Second Chance and/or its use of Zylon in bullet-resistant vests; and (3) documents relating to the use of Zylon by body armor manufacturers other than Second Chance, including Point Blank.  Toyobo's duty to preserve documents in each of these categories will be discussed in turn.

---

[19]    Toyobo objects to the consideration of these privilege logs because they say the logs are not part of the record before the Court, that Plaintiffs improperly submitted them under the guise of a supplemental memorandum and that Toyobo has not had an opportunity to substantively respond.  Because the Court is not determining when the Toyobo Defendants evidence-preservation duty to Point Blank arose, this dispute is academic.

### (i) Zylon-Related Documents

First, because of pending litigation over the use of Zylon in vests manufactured by Second Chance, beginning in November 2003, Toyobo was under a duty to preserve documents relating to Zylon generally (*i.e.*, research information, test data, internal correspondence, etc.) and documents relating to Second Chance and/or its use of Zylon in its bullet-resistant vests.

But Point Blank has not produced any evidence that documents created or received by Toyobo before November 2003, and that remained in existence as of November 2003, were destroyed after November 2003. Therefore, there is no basis for any sanctions for allegedly "missing" documents created before November 2003.

### (ii) Second Chance-Related Documents

Additionally, Point Blank has not submitted any evidence that Toyobo destroyed any documents specifically relating to Second Chance, including communications between Toyobo and Second Chance, at any time -- much less after a duty to preserve those documents arose. Therefore, there is no basis for a finding of spoliation of documents specifically relating to Second Chance or its use of Zylon in bullet-resistant vests.

However, there is no doubt that Toyobo was aware of myriad litigation and investigations concerning Zylon and bullet-resistant vests manufactured with the fiber. Toyobo had received subpoenas and document requests which called for the production of communications with *all* manufacturers using Zylon, not merely Second Chance.

Therefore, Toyobo was under a document preservation duty to the United States Department of Justice, the Massachusetts Attorney General, Second Chance and Armor

Holdings.   Because these parties requested communications with *all* manufacturers, Toyobo had a duty to those specific parties to preserve communications with all manufacturers -- but not necessarily a duty to Point Blank.   *See, e.g., Managed Care Solutions*, 736 F. Supp. 2d at 1326-27 (holding that a party's duty to preserve evidence relating to a particular issue does not arise simply because litigation has been filed; rather, such a duty arises only once a party can reasonably anticipate that the particular issue will be the subject of future litigation); *Silhan v. Allstate Ins. Co.*, 236 F. Supp. 2d 1303, 1309 n.8 (N.D. Fla. 2002) ("It is essentially impossible for everyone . . . to hold onto every piece of potential evidence just because there is a possibility that litigation may arise sometime in the future.   It is unreasonable to view the concept of duty on such a broad scale. *The more prudent approach would be for a duty to arise when the possessor of the evidence is informed by the plaintiff that a lawsuit will be (or is) filed.*") (emphasis added).

### (iii) Documents Related to Zylon Use By Manufacturers Other Than Point Blank

With respect to the final category of documents -- communications between Toyobo and other body armor manufacturers -- the parties who *could* have enforced the duty to preserve (i.e., the United States, the Massachusetts Attorney General, etc.) did not seek any type of sanction.

Point Blank did not give any express, overt indication to Toyobo that Point Blank was contemplating litigation with Toyobo until December 2006, when Point Blank met with Toyobo's counsel to discuss resolution of outstanding issues relating to Zylon. Following this meeting, Point Blank waited more than two and a half years -- until July 31, 2009 -- before it filed its complaint against Toyobo.   Therefore, Toyobo says it did

not owe a specific duty *to Point Blank* to preserve documents until December 2006, at the earliest. *See, e.g. Managed Care Solutions*, 736 F. Supp. 2d at 1326-27; *Silhan*, 236 F. Supp. 2d at 1309 n.8; *Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759, at *4 (E.D. Ark. Aug. 29, 1997).

The Court is not swayed by the additional factual arguments urged by Point Blank. For example, the mere fact that Toyobo retained a public relations firm in late 2003 and began placing documents dated December 2003 on a privilege log does not mean that Toyobo had a document preservation duty **to Point Blank**. These developments may mean only that Toyobo was concerned about government investigations into the Second Chance vests containing Zylon and the lawsuit filed by Second Chance. In other words, it reflects a concern over Second Chance litigation and anticipation of litigation with others besides Point Blank. It is difficult to reconcile the argument that Toyobo should have anticipated litigation with Point Blank when Point Blank continued to publicly and privately support the product for several years.

### *Shifting Duty*

Finally, the Court will address Point Blank's "shifting" duty and industry-wide litigation arguments.

In support of these positions, Point Blank relies on *Phillip Adams & Assocs. LLC v. Winbond Elec. Corp.,* No. 1:05-CV-674 TS, 2010 WL 3767318, at *3-4 (D. Utah Sept.16, 2010) (finding duty to preserve because "the industry as a whole was aware of potential litigation") and *Livingston v. Isuzu Motors, Ltd.*, 910 F. Supp. 1473, 1494 (D. Mont. 1995) (noting that knowledge of a Jeep "rollover problem" and "industry-wide"

issues regarding narrow track utility vehicles was sufficient to generate document preservation duty).

The Court rejects the shifting duty argument and deems it unnecessary to rule on the industry-wide litigation theory. The shifting duty theory is incompatible with the basic rule that a duty is owed to a specific party.

It is well-settled that the duty to preserve potentially relevant evidence "arises when the party in possession of the evidence knows that litigation **by the party seeking the evidence** is pending or probable." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008) (emphasis added); *see also Silhan*, 236 F. Supp. 2d at 1309, n.8; *Hickman v. Carnival Corp.*, No. 04-20044 CIV UUB, 2005 WL 3675961, at *2 (S.D. Fla. July 11, 2005) ("The existence of a potential civil action and/or the duty to preserve evidence must be based on more than the mere possibility that something may occur at some time in the future."); *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526-27 (N.D. Cal. 2009) (holding that a "general concern over litigation" concerning the product RealDVD did not "create a duty to preserve all documentation related to RealDVD" and that a duty to preserve only arose when "a potential claim was identified or future litigation was probable" with the parties in question).

Point Blank's shifting duty argument was recently rejected by a federal district judge in the Eleventh Circuit. In *In re Delta/Air Tran Baggage Fee Antitrust Litigation*, No. 1:09-md-2089-TCB, 2011 WL 915322 (N.D. Ga. Feb. 22, 2011), the plaintiffs moved for spoliation sanctions and relied upon a United States Department of Justice Antitrust Division Civil Investigative Demand ("CID") as grounds for the requested sanctions. According to Plaintiffs, Delta received the CID in early February 2009 but

waited until mid-May 2009 to suspend its standard document destruction policy and also waited until sometime between mid-May and early June 2009 to instruct IBM to preserve its backup tapes.  This delay, according to the plaintiffs, caused the deletion of documents going back to July 2008.  The gravamen of the plaintiffs' spoliation theory against Delta was that Delta failed to take immediate and adequate document preservation steps after receiving the **government's** investigative demand for documents.  The plaintiffs urged an adverse jury instruction on spoliation.

Because there is not much authority addressing this shifting duty theory, it is appropriate to discuss the Court's comprehensive analysis in *Delta/Air Tran* in some detail:

As a threshold matter, before addressing the question of whether Delta acted appropriately in response to the CID, the district court explained, "Plaintiffs must first show that Delta owed **them** a duty to preserve documents."  *Id.* at *5 (emphasis added). The district court also focused on the all-important fact that the spoliation motion "rests upon a critical assumption: that they (as private parties in civil litigation) can enforce" the provisions of a confidential government CID "when there is no suggestion that the DOJ has taken action against Delta for failure to comply with the CID."  *Id.*

In rejecting the Plaintiff's argument, the court described the approach as a "sweeping and novel theory of spoliation" and noted that no authority was cited to support it.  *Id.*

Not surprisingly, the court there recognized that Delta had a duty to the DOJ to preserve all relevant documents but then explained its "difficulty [in] accepting the notion

that at that time, as a matter of law, Delta immediately owed the same duty to *Plaintiffs.*" *Id.*

The plaintiffs in *Delta/Air Tran* urged the same discovery/document preservation duty philosophy as the Point Blank Plaintiffs but the district court refused to accept the idea that *any* party could seek spoliation sanctions for breach to a third party to preserve documents. The court was also unwilling to accept the argument that civil litigation filed by one or more parties against a business receiving a CID or government subpoena is reasonably foreseeable. *Id* at *6.[20]

Point Blank tries to avoid the holding in *Delta/Air Tran* by explaining that they are not trying to "piggy back" upon document preservation duties owed to others. Rather, they say they are relying on the document demands from others to prove that Toyobo reasonably anticipated litigation with Point Blank because of publicity and widespread litigation across the entire industry.

Neither party has called this Court's attention to a federal appellate case analyzing the shifting duty or industry-wide litigation theories. Nevertheless, based on *Delta/ Air Tran* and its own analysis, the Court rejects the shifting duty approach. A lawsuit filed by Second Chance and a subpoena issued by the government do not necessarily mean that Toyobo should have at that time anticipated litigation with Point Blank or that Point Blank can take advantage of an evidence-preservation duty owed by Toyobo to Second Chance or different government agencies.

---

[20]     The Court pointed out that Delta received numerous CIDs, subpoenas or other demands for information from the DOJ which did not lead to either private or government litigation. Moreover, the Court explained that "Delta owed no preservation duty to Plaintiffs that it could have breached" and "if Delta failed to comply with the CID, the DOJ – not Plaintiffs – is the appropriate party to take action." *Id.*

### *Industry-Wide Duty*

The industry-wide theory, however, appears more logical.  Although the Eleventh Circuit has not adopted the industry-wide theory of an evidence-preservation duty, there are courts that have.  *See, e.g., Livingston*, 910 F. Supp. at 1473 (car manufacturer on notice of industry-wide litigation, thereby triggering duty to preserve documents).  And Defendants have not cited to an Eleventh Circuit case which expressly rejected the approach, either.

Point Blank contends that the Second Chance lawsuit, the subpoenas from government agencies and other developments (such as engagement of a public relations firm in October 2003 to assist with "possible litigation concerning Zylon fiber") generate the conclusion that Toyobo was on notice of litigation with Point Blank long before 2006 because Toyobo was on notice of industry-wide litigation concerning Zylon.  Toyobo, of course, has contrary arguments, such as Point Bank's public and private statements supporting Zylon (which would seemingly undermine any industry-wide theory of anticipating litigation with Point Blank).

Given that the Parties implicitly concede that the Eleventh Circuit has neither adopted nor rejected the industry-wide theory of document- preservation duties, the Court is reluctant to take a position when one is unnecessary to resolve the motion.

### *When Did the Duty Arise?*

Even though the Court rejects the shifting duty theory and does not decide whether to adopt the industry-wide litigation theory of evidence-preservation duties, it is also not deciding specifically whether Toyobo was under a duty to Point Blank to preserve documents in 2003 (or any other time before December 2006).

Toyobo obviously was under a document preservation duty to Point Blank *at some point*.  But determining whether that duty arose in late 2003, early 2004, late 2004, some point in 2005, February 2006, December 2006 or 2009 (when the lawsuit was finally filed) is a complex assessment which the Court need not make.

Avoiding a decision on **when** Toyobo's duty to preserve for Point Blank's benefit arose generates another benefit: it eliminates the need to address the potentially thorny issue of the specific contours of a document preservation duty in 2003 and 2004. Although it may seem obvious *now*, in 2011, that a party is required to implement a litigation hold to preserve e-discovery, the Court recognizes that, to paraphrase famous singer-songwriter Robert Zimmerman, "the times they were a-changin'" -- and in the world of e-discovery the times of 7 and 8 years ago were significantly different than now.[21]

In addition, the Court need not analyze other potentially dicey issues:  what are the consequences if a party voluntarily implements an oral litigation hold when it was not under a duty to impose any type of e-discovery litigation hold yet does so negligently and vaguely and fails to adequately monitor whether the employees are actually following the hold's directives?  *Cf. Pension Comm.,* 685 F. Supp. 2d at 471, 476 (noting that the age of the case requires a culpability analysis of a party's conduct before and after a certain

---

[21]     Robert Zimmerman is more-widely known as Bob Dylan.  "The Times They Are a-Changin'" is a well-known song which Mr. Dylan released as the title track of his 1964 album of the same name.  The song was ranked #59 on *Rolling Stone's* 2004 list of "The 500 Greatest Songs of All Time."  http://en.wikipedia.org/wiki/The_Times_They_Are_a-Changin%27 (last visited Apr. 4, 2011) (citing *http://www.rocklistmusic.co/uk/rstone.html#500Songs*).

date and concluding that, in the Southern District of New York after July 2004, a laundry list of failures support a finding of gross negligence).[22]

## C.     The Importance of the Evidence to Plaintiffs' Case

To prevail on its motion for spoliation sanctions, Point Blank must demonstrate that it is "unable to prove [its] underlying action owing to the unavailability of the [allegedly spoliated] evidence." *Corporate Fin., Inc. v. Principal Life Ins. Co.*, No. 05-20595-CIV, 2006 WL 3365606, at *2 (S.D. Fla. Nov. 20, 2006) (quoting *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003)). Indeed, "[s]poliation actions typically involve the destruction of evidence that is absolutely crucial to the action." *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 165 F. Supp. 2d 1345, 1360 (S.D. Fla. 2001); *see also Flury*, 427 F.3d at 943;

---

[22]     In her widely-quoted and broadly-discussed opinion in *Pension Committee*, Judge Scheindlin identified (among other failures) the following as "gross negligence" after July 2004 (after a duty to preserve has attached in a specific case):  the failure to issue a written litigation hold and the failure to cease the deletion of email.  In the instant case, it seems that Toyobo did not implement a written litigation hold until February 23, 2006 and did not provide specific instructions (clear enough to be understood by all key employees) to not destroy future documents (created or received after November 2003) and to preserve communications with all manufacturers until then.  It also seems that neither Toyobo or its counsel monitored compliance with the oral litigation hold and did not elevate the hold into a specific, written hold after the July 2004 date deemed a critical date by Judge Scheindlin (i.e., in February 2006).  Moreover, the February 2006 memo appears to be the first written instruction from counsel to Toyobo to preserve documents and does not caution Toyobo to halt or adjust its automatic document deletion/overwriting programs.

Thus, if the Southern District of New York standards governed here, then Toyobo's discovery missteps would be classified as grossly negligent after July 2004.  It appears as though one or more of the lawyers advising Toyobo about its Zylon-related document preservation duties in 2003 through the present were (and are) based in New York City (i.e., in the Southern District of New York).  *Cf. ACORN*, 2009 WL 605859, at *4 (noting that defendant's claim of a verbal hold amounts to gross negligence and pointing out that the record does not indicate who received the verbal directive, when it was received or whether the attorneys followed up to ensure compliance).

*F.T.C. v. Nationwide Connections, Inc.*, No. 06-80180-CIV, 2007 WL 4482607, at *1-2 (S.D. Fla. Dec. 19, 2007).

If Point Blank cannot show that it is "sufficiently impaired in [its] ability to prove its case," then it cannot show "entitlement to an adverse inference based on any destruction of [documents]." *Nationwide Connections*, 2007 WL 4482607, at *3; *see also Managed Care Solutions*, 736 F. Supp. 2d at 1327-28 (denying plaintiff's motion for sanctions, including entry of default judgment, because allegedly spoliated evidence was "not crucial" and "cumulative at best," and because "plaintiff would still be able to prove its case through additional already obtained evidence"); *Walter*, 2010 WL 2927962, at *3 (denying plaintiff's motion for adverse presumption jury instruction based on fact that defendant lost supposedly "crucial" deck chair which caused plaintiff's injuries, noting that there was no evidence of bad faith and that defendant "willingly produced other evidence demonstrating the construction and condition of the broken chair"); *Wilson*, 2008 WL 4642596, at *3 (denying plaintiff's motion for adverse presumption jury instruction or, alternatively, an adverse inference jury instruction, because missing evidence is "not critical to [p]laintiff's ability to prove her case because there is other evidence potentially available to [p]laintiff to prove her claim.").

Point Blank must also "demonstrate that the deleted [documents] had more than 'tangential relevance' to its claims." *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 347 (M.D. La. 2006). The Court cannot make "an 'inferential leap' that because some relevant [documents] are in existence, the deleted [documents] must have been relevant also." *Id.* at 347.

Point Blank has failed to present evidence that any allegedly destroyed internal documents were in any way "crucial" to Point Blank's ability to prove its claims.  By Point Blank's own admission, Toyobo has produced hundreds of thousands of internal documents.  From its review of those documents, Point Blank has even assembled a "book" of what it contends are multiple "egregious" examples of information concerning Zylon degradation that was not shared with Point Blank.  Point Blank also has documents, including "internal blog" documents, produced by Toyobo that Point Blank contends are "very damaging" and "strong for [Point Blank's] case."  (DE# 180, pp. 274-275).[23]  In addition, Point Blank moved for partial summary judgment based, in large part, on multiple internal Toyobo documents.  *See* Plaintiffs' Motion for Partial Summary Judgment (DE# 196, pp. 5-6, 11-12); Plaintiffs' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment (DE# 197, ¶¶ 24-38).

Concerning the allegedly "missing" communications between Toyobo and Point Blank, there is *no* impairment to Point Blank's ability to prove its claims.  Point Blank admitted that it has its own copies of "virtually all the communications."  (DE# 180, p. 197:21-23).  This reality is inherently inconsistent with a claim of *prejudice* caused by the absence of critical evidence. *Corporate Fin.*, 2006 WL 3365606, at *2 (denying request for adverse inference and noting that Plaintiffs are not "sufficiently impaired" because, *inter alia*, they have exact copies of the documents in the files destroyed by Defendants).

---

[23]    At the evidentiary hearing, Point Blank's counsel argued that Point Blank could prove its case based on the documents Toyobo produced.  In addition, counsel acknowledged that "to a large extent, . . . we're **not harmed** by it" [Toyobo's failure to produce documents]   because "we **do have** these documents." (DE# 180, p. 198) (emphasis supplied).

Given that Point Blank has conceded that "there is other evidence potentially available to [p]laintiff to prove [its] claim," *Wilson*, 2008 WL 4642596, at *3, Point Blank has failed to make the requisite showing that Toyobo destroyed any documents that are *crucial* to Point Blank's ability to prove its case. *Cf. Managed Care Solutions*, 736 F. Supp. 2d at 1328 (allegedly spoliated evidence would be cumulative at best).

**D.     Bad Faith**

The Eleventh Circuit has stated that "[t]he key to unlocking a court's inherent power [to impose sanctions for discovery abuses] is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

As outlined above in the "Basic Principles" section, parties can establish the requisite bad faith through either direct or circumstantial evidence. *Calixto*, 2009 WL 3823390, at *16. Point Blank has impliedly conceded that it has no direct evidence of bad faith. In its Plaintiffs' Memorandum of Law in Support of Motion for Determination of Spoliation of Evidence and Appropriate Sanctions, for example, Point Blank explains that "it cannot establish the exact circumstances surrounding their [deleted emails and backup tapes] destruction." (DE# 119, p. 13). Likewise, Point Blank's proposed findings of fact and conclusions of law discuss only the circumstantial evidence method of proving bad faith, another implicit acknowledgement that it does not have any direct evidence of bad faith.

To demonstrate that Toyobo destroyed evidence in bad faith through circumstantial evidence, Point Blank must establish all of the following four factors: (1) evidence once existed that could fairly be supposed to have been **material** to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative

act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence, and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Calixto,* 2009 WL 3823390, at *16. *See also Managed Care Solutions,* 736 F. Supp. 2d at 1331-32 (adopting four-factor test for circumstantial evidence of bad faith).

As discussed above, Point Blank cannot show that any documents *material* (i.e., *critical*) to the proof of its claim once existed but no longer exist. Therefore, Point Blank cannot meet the first element required for a showing of bad faith based on circumstantial evidence.

Point Blank has also failed to show that any Toyobo witnesses destroyed any documents they believed to be relevant to any ongoing or foreseeable litigation and, therefore, has not established that Toyobo "engaged in an affirmative act causing" any material evidence to be lost. As a result, Point Blank cannot meet the second element required for a showing of bad faith based on circumstantial evidence.

Because Point Blank cannot establish all of the elements of circumstantial bad faith -- and has not introduced any direct evidence of bad faith -- it is not entitled to spoliation sanctions. *See, e.g., Bashir*, 119 F.3d at 931 (holding that destruction of evidence must be predicated on bad faith in order to sustain an adverse inference sanction, and that mere negligence is not sufficient to support an adverse inference).

Point Blank's assertion that bad faith can be assumed on Toyobo's part due to the failure of Toyobo's counsel to issue a written litigation hold is not dispositive. Although the failure to issue a litigation hold is surely relevant to the Court's consideration and

may be dispositive or more significant in other Circuits, it is not a dispositive issue in this Circuit.  As discussed above, the failure to timely place a litigation hold is often viewed as "merely negligent" and insufficient to justify spoliation sanctions. *Managed Care Solutions,* 736 F. Supp. 2d at 1328.  *See also Southeastern Mech. Servs*, 2009 WL 2242395, at *3-4 (declining adverse inference even after concluding that Plaintiff's failure to have its litigation hold suspend the routine overwriting of backup tapes was "baffling").

Moreover, while the Court may consider the absence of a written litigation hold in evaluating a claim of bad faith in the spoliation context, the inquiry does not end with a finding that no formal *written* litigation hold was issued.  Indeed, courts in this Circuit do not equate an oral litigation hold with bad faith.  *See, e.g., Floeter,* 2007 WL 486633 at *7 (failure to preserve computer and backup tapes was negligent but insufficient to establish bad faith).

Although the evidence demonstrates that Toyobo put *some* type of litigation hold in place in November 2003, it was not written and it was not clear and it undoubtedly was interpreted differently by different employees.  For example, Mr. Saito's testimony about his understanding of whether the litigation hold covered communications with manufacturers other than Second Chance changed during the evidentiary hearing but he ultimately took the position that it *did* cover these other communications.  But Mr. Kuroki testified that the hold was limited to communication with only one manufacturer (Second Chance) and that communications with different manufacturers need not have been preserved if they did not concern the Second Chance litigation.  (DE# 180, pp. 126-27).

Thus, as it turned out, the oral litigation hold *was* inadequate -- at least insofar as Toyobo had a duty toward the other parties who imposed document production and preservation obligations.  In addition, Toyobo's belief that the only relevant documents concerned Zylon vests manufactured by Second Chance appears now, in hindsight, to have been fundamentally incorrect -- because several parties, including government investigators, specifically required communications with *all* manufacturers.  Moreover, it is apparent in hindsight that the oral litigation hold was unlikely to have **ever** functioned adequately because, among other reasons, the specific multi-page list of documents to be collected was never circulated to the employees in the first place.

Nevertheless, Toyobo contends that its lack of bad faith is further illustrated by the fact that it did, in fact, produced hundreds of thousands of pages of documents, including those Plaintiffs deemed to be "egregious."  In other words, Toyobo argues that it would have done a far more competent job of destroying negative evidence it if had been acting in bad faith or intentionally scheming to spoliate evidence.  This argument has some merit.  *See Sampson v. City of Cambridge, Md.,* 251 F.R.D. 172, 182 (D. Md. 2008) (holding that defendants' conduct did not rise to the level of bad faith, despite not issuing a litigation hold, because, *inter alia*, employees had been instructed to retain their files and defendants had, in fact, produced hundreds of e-mails); *Walter*, 2010 WL 2927962, at *2 (denying plaintiff's motion for an adverse presumption jury instruction based on fact that defendant lost supposedly "crucial" deck chair which caused plaintiff's injuries, noting that defendant "willingly produced *other* evidence demonstrating the construction and condition of broken chair") (emphasis added).  *Cf. Wilson*, 2008 WL 4642596, at *3 (denying plaintiff's motion requesting adverse presumption jury

instruction or, alternatively, adverse inference jury instruction, because missing evidence was "not critical to [p]laintiff's ability to prove her case because there is other evidence potentially available to [p]laintiff to prove her claim").

In sum, Point Blank has not met its burden of establishing that documents crucial to its case were destroyed in bad faith.

## VIII.   CONCLUSION

Point Blank has failed to meet its burden to establish a claim of spoliation and to show the additional bad faith necessary to impose the adverse inference sanction.  As a result, Point Blank's motion is **denied**.

As explained above, an adverse inference jury instruction is inappropriate under Eleventh Circuit law.  Moreover, although there are times when courts award fees and costs even though they rejected the requested adverse inference instruction, those cases are fact-specific and inapposite.[24]  In those cases, the discovery failings typically arose in

---

[24]       *See Preferred Care Partners Holding Corp.*, 2009 WL 982460 (awarding fees and costs for "inexcusable" and "grossly negligent" destruction of evidence **two months after the discovery period ended and one month before trial** while denying substantive sanctions such as adverse inference jury instruction, default judgment, summary judgment, partial summary judgment or an order deeming certain matters admitted at trial).  *See generally, ACORN,* 2009 WL 605859 (awarding costs and attorney's fees for failure to timely implement a litigation hold **after the filing of the lawsuit** even though the court rejected the adverse inference request and even though Plaintiffs failed to show the relevance of the allegedly destroyed materials and even though the court did not accept the argument that the existence of some documents demonstrates that other documents most likely were destroyed); *Field Day, LLC v. County of Suffolk*, No. 04-2202, 2010 WL 1286622 (E.D.N.Y. March 25, 2010) (denying sanctions in the form of an adverse inference, the striking of pleadings or preclusion orders, but awarding attorney's fees and costs for failure to implement litigation hold **after a lawsuit against the sanctioned party defendant was filed** even though the court did not conclude that Plaintiffs suffered any prejudice because destroyed documents were otherwise obtained).  *Cf., Floeter*, 2007 WL 486633, at *3, n.3 (noting that counsel never issued a litigation hold **after a lawsuit was filed and served** but denying motion for sanctions, including an adverse inference); *Sampson v. City of Cambridge*, 251 F.R.D.

the midst of the very lawsuit involving the party seeking sanctions.  Here, the lawsuit was filed in 2009 and the conduct at issue arose years *earlier.*

Finally, Point Blank could conceivably seek to introduce the evidence surrounding Toyobo's alleged loss or destruction of evidence at trial.  *Managed Care Solutions*, 736 F. Supp. 2d at 1334.  If Point Blank pursues the issue at trial despite the absence of the adverse inference jury instruction sanction, then the presiding district judge will determine whether this type of evidence is admissible at trial.  Because the issue of trial admissibility issue is not before me, I will not analyze it in this order.

DONE AND ORDERED in Chambers, at Miami, Florida, this 5th day of April, 2011.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Hon. Patricia A. Seitz
Counsel of Record

---

172 (D. Md. 2008) (denying motion for adverse inference because failure to implement litigation hold **after receipt of electronic evidence preservation letter and after filing of the lawsuit** was not done willfully or in bad faith and because documents were not relevant -- but awarding monetary sanctions requiring defendant to pay an e-discovery consulting firm's costs to forensically examine a hard drive).